We'll turn to the next case on our calendar, Patrick Lynch v. National Prescription Administrators Good morning, counsel. Good morning. May I proceed? Yes, please. May it please the Court, my name is Matthew Jasinski. I'm with Motley Rice on behalf of the appellant, Patrick Lynch. From 1981 to 2002, the union funds that provide for health care benefits for active and retired New York City police officers relied upon the defendant, NPA, to negotiate prescription drug prices with pharmacies, to process claims, to pay the pharmacies with the funds' money, and beginning in 1993, to negotiate rebates with drug manufacturers, which NPA promised to pay. Why isn't this a breach of contract suit from the beginning? So, Your Honor, I think, candidly, when the case was brought, predecessor counsel believed it was an ERISA case, and it was pled in the context of ERISA and ERISA fiduciary law. It's a union case, it's not an ERISA case. And so the ERISA claims were dropped, the fiduciary duty claim was already extant in the case, and it was preceded on that basis. But I think it's very important to note here, this case was transferred to an MDL, it was a bit of the tail on the dog. But it was tracked with another case that was brought by COBA, the correction officers. And we, the funds, and COBA were jointly pursuing the claims against NPA, the non-ERISA common law claims against NPA. COBA had expressly asserted the contract claim. The funds had not, but yet, together, were bringing this case and sought class certification together for, among other things, a breach of contract claim. And so really, and I think this gets to the amendment piece, but really, as a matter of cleanup, a motion for leave to amend to put the contract claim in the complaint was made, because that was, in fact, a claim that was already being pursued. And the amendment was denied not on grounds of futility, right, but on grounds of being too late. Prejudice. Well, yes and yes. And so implicit prejudice on the basis of delay, and I think I'm getting to, I'm reversing my order here, but getting to the abuse of discretion issue on not allowing the amendment, is that mere delay, it's clear, is not in and of itself prejudicial. Now, certainly, and I think Judge Winters is in the Block case, that the longer that there's an unexplained delay in making a motion, the less the burden is on the defendant to show prejudice, but you still have to find some prejudice. You're just saying they were on notice all along that this was a breach of contract case. They were on notice all along that breach of contract was a claim that both COBA and the funds were pursuing. And I think it's interesting to note, Your Honor, that if we had been absent from the litigation, and COBA had a putative class action, then we would not have had to go through that by definition included the funds. If we had been absent from the litigation and COBA gave up the fight, which it ultimately did, at that point we would be entitled to file afresh a contract claim, we would have the benefit of tolling from COBA's case. So we're punished because we were already in the litigation, even though we were really pursuing this contract claim with COBA. So I think that piece is there's no prejudice. And since I'm on the amendment side, I'll mention a couple of things that I want to address more specifically, which is, you know, in terms of discovery, discovery had not closed. Class certification discovery had been ongoing. The defendants had decided not to take depositions of our witnesses until after the motion for class certification was filed. So they, in the record, what you'll see is Exhibit B to the motion for leave to amend was when we formally provided the draft proposed amended complaint to the other side. That was in October of 2010. It was after that point that they deposed our witnesses. So they had the benefit of not only knowing that we were pursuing a contract claim with COBA for purposes of class certification, but they actually had our proposed amended complaint at that point. So I'm sorry, Your Honor. For 10 years. Well, now at this point, yes. So this case is, you know, the case was filed in 2003. It took some time ultimately to be transferred to the MDL, but things didn't really get going in our piece of this. Remember, 20 cases in the MDL. So this particular case was ramping up for classification in 2010. So that's the time at which. That's the time at which we're saying the issue, and I think this is clear from the district court, the district court got this much correct, right? That the district court wasn't saying it's too late in 2017 or 2018 or whenever the court is addressing it to bring the amendment. The court is looking at it from the perspective and should be looking at it from the perspective it was 2010 too late. So the court should be looking at it from that perspective. It's not entirely clear, I think, Your Honor, that that was really the perspective that Judge Daniels gave. I think that so Judge Daniels says plaintiff's failure to provide any justification for his undue delay and the further delay in these proceedings that would result of his motion were granted warrant that I will leave to amend. Well, the delay of proceedings that would continue from this point, I don't think that we should be charged with the 10 years that elapsed between the time of the filing of the motion to amend. Anyway, so maybe Judge Daniels understood this or maybe he didn't. But your position certainly is that we should be looking at whether it was too late to make the motion when the motion was made in 2010. And we should be looking for prejudice to the defendants as of that date that would have occurred. I mean, conceivably, they could say everybody died last year who we wanted to call as a witness. But that's not really the right way to look at it because you're only liable or taxed with the delay for whatever reasons that occurred up to the time the motion was made. That's correct, Your Honor. Right. Exactly. And I think there was no prejudice as of 2010 for the reasons I've just described. I see my time is short. I do want to touch on the fiduciary duty piece of this because I think the Judge Daniels made two principal errors here on fiduciary duty. The first is one of law, which is the notion that because there was a contract here, which doesn't expressly say fiduciary in it, that somehow there had to be some breach of some other obligation, extracontractual obligation, as the Court put it, in order to create this duty. But I guess my problem is, yeah, I understand that it's not just determined by there's no mention of fiduciary in the contract. But lots of businesses and lots of entities are constantly hiring people with some purported degree of expertise. You hire IT people to set up your computer system, for example. You couldn't do it yourself. You're kind of heard on good authority that these people are competent, and you hire them. Right. And you're relying on their expertise. You hire investment advisors. You hire lawyers. You hire everybody that works for you in some professional capacity. And some of them, there's a long tradition of we treat these people as fiduciaries. Others, these are, this is their business to do this. There's a negotiation. The negotiation actually does put in a contract term that says they're supposed to do the very thing that you want them to do. In a certain sense, you're not relying on, they have some generalized obligation. We could have made a contract that said they get to keep the rebates, for example. And if you'd made that contract, I don't think you'd be here. That would be a different contract. And I see my time is up. May I answer Your Honor's question, which is I think, you know, first I wanted to speak to the legal nuance of this, which is really, yes, there's a contract, but the law is clear that fiduciary arises out of the relation. So we have to look at the relation. And I think the relationship here is one of principle and agent. So the contract that you just described, Your Honor, where there was something that allowed the PBM, the pharmacy benefit manager, to keep rebates or to keep spread would not be an agency relationship because essentially the PBM is saying we go over here and we negotiate with pharmacies and we set a price over here and then we come over here and we say this is the price we offer you and we take the difference. That's not what they did here. What they did here is they said we will reimburse the pharmacies with your money at the rates we negotiate for the pharmacy. They didn't have any of their own skin in this game or they shouldn't have. And what arises out of that is a duty not to self-deal, because the allegation in this case is that instead of simply negotiating a price with the pharmacy for the prescription drug and having the fund's money reimburse that price, they've actually self-dealed by inflating that price with other side deals with pharmacies and then subsequently with manufacturers. Breyer. Well, it gets more complicated, though, once you put the side deals in, right? Because they're not just your agent. They're the agent for a lot of people. So suppose there were some drugs that were of particular interest to police officers. Police officers have a very stressful job, so they may be interested in some anti-anxiety medications or things like that. I'm just making this up. Hypothetically, police officers might need more than somebody else. Meanwhile, there are other people, other unions, other businesses on whose behalf this pharmacy manager is operating, and they're interested in other things, anti-psychotic meds or something like that. You're not suggesting that the defendants couldn't trade off one against the other and say, well, you know, net it's going to be better for most people, more of our customers, if we make a deal on this and agree to pay a little more on that. They're not obligated to make or seek out all the best rebates for police officers. Well, and I would say, Your Honor, that the claim here is about their loyalty rather than a standard of care. So certainly, you know, you can have, you can be an agent for multiple principles, and we cite a restatement provision that, you know, provides that. So there's nothing about the fact that they represented other plans that means they can't be an agent for all of those plans. To the extent that they're making a negotiation where they're looking at the entire mix of prescriptions, fine. I mean, they're not, the allegation here is not that they somehow didn't get the best deal they could. The allegation is actually that they were taking a piece, they were taking a VIG. My hypothetical is different because your allegation is self-dealing, not trading off, not that they weren't exclusively loyal to you as distinct from, because they favored some other principle. Your allegation is they did get a good deal for us, but then they just pocketed the. Well, they were, yeah, it was, the reason it wasn't as good a deal as it should have been is because they were taking a piece of the pie, not because of, you know, as you put it, the negotiation. They got the price. Right, exactly, exactly. So, and I realize my time is up. I'd say at the end of the day, there's a duty here, whether it's in contract or breach of fiduciary duty, we don't think they're duplicative, but we should be able to proceed with the claim. Thank you, counsel. Thank you. We'll hear from the National Prescription Administrators, Administration, Inc. Thank you, Your Honor. Christopher Smith for National Prescription Administrators. May it please the Court. I'd like to start with some of the basic fiduciary duty principles. First of all, New York law is clear that in an arms-length transaction, commercial relationship like this, no fiduciary duty arises absent extraordinary circumstances. And quite frankly, there is no evidence of the type of extraordinary circumstances that would convert this from an otherwise arms-length contract relationship to a fiduciary one. And, in fact, I think their concession that the claims, the contract claims at issue, involve the same underlying conduct is fatal. When you look at their proposed contract amendment, the same things that they were talking about, that we were supposedly mischaracterizing rebates as admin fees and some of the nuances there, that's what they want to put in their contract claims. It's exactly the same, and they have conceded as much. That's fatal. New York law requires a duty independent of the contract. And respectfully, they have shown no duty here independent of the contract. Now, the district court properly looked to decades of New York precedent on this, including the New York AG case involving Express Scripts. And as the district court explained, while they may have relied on NPA to manage the pharmacy benefit program, that was exactly the very relationship that was at issue. That was the agreement. Lynch offers no response. He doesn't even address that case. Now, they've made a lot of statements today, and, Judge Lynch, I heard you speak of this concept of agency. And I want to take a step back and dispel this entire. Okay. Thank you. I want to dispel that entire thing. And first, let me start with one basic precept. That was not an issue they raised in the district court. It came up for the first time, frankly. It was articulated in their reply brief. So there's an argument that that has been waived. But I'm not afraid of it. It's easily responded to, and I think it's intertwined with why their other fiduciary arguments fail. So let's take a step back to 1980, a year before this contract was entered in 1981. What were the funds doing? They would send their members to pharmacies, and the members would present a prescription at the pharmacy. They would get a receipt, and they would come back to the funds, and they would present the receipt for reimbursement. They came to NPA because NPA had pre-established contracts with the pharmacies and NPA across the nation that had discounted prices. And they could choose, as Your Honor observed, different people have different choices. You may want a narrow network. You may want a broader network. If you're a New York plan, you may say, I want the network that NPA has negotiated for this region, and maybe I can get a better price. So you choose that. But, again, these relationships, these contracts were already in place. And the same is true of the manufacturer relationships that formed the 1993 fiduciary or 1993 rebate agreement that they say created a fiduciary obligation. In that context, so Mr. Hickey, who was the PBA administrator that negotiated the 93 amendment, he testified that before they entered into that agreement, he met with Mr. Ullman, who was the president of NPA, and Mr. Ullman explained to him, and he understood, that the contracts at issue were contracts between NPA and the drug manufacturers, that NPA had negotiated this on its — for its own business as part of its product offering. And, again, I can't emphasize this enough. The product offering were the contracts. It was access to the contracts that NPA had. So essentially your position is this is not a case in which the PBA hired you to negotiate on their behalf with manufacturers and pharmacists. Absolutely, Your Honor. And I think that is a fundamental difference between some of the agency cases they make. So an agent, for example, might enter into a contract to attempt to bind the principal. This is not — this is not what's happening here. These preexist the relationship with the PBA, and they post — they post-date the relationship. So when the PBA freely terminated its relationship with NPA, NPA continued the same contractual — contractual relationships that it had with the pharmacies and with the drug manufacturers. Now, Your Honor, they cite to the contract and some other documents and say this suggests that there was an understanding that they were negotiating on their behalf. That does not exist in those documents. In fact, one thing they cite to in the record that I think is particularly worth highlighting is the contract itself and the definition of a participating provider. And this is at CA-27. What does that definition say? It says a provider who has entered into a written contract with NPA, a provider who has a written contract with NPA. And that's the language that they want to suggest, said that NPA was going to go out and contract on their behalf, enter into contracts for them? Your Honor, it just — it doesn't exist. And frankly, it defies logic. It defies the record. It defies common sense and logic. And I think the Sixth Circuit put this well in DeLuca. When they explained the financial benefit that comes from this type of relationship that underlies this type of negotiation, you know, the market power that an NPA can get comes from NPA negotiating as NPA, as the entity. And if they were negotiating on a plan-by-plan basis, if they were negotiating for individuals, that market power would be eroded. It would be zero. So this idea, this concept that they came to us to have us negotiate new contracts for them as their agent, it's belied by the facts, it's belied by the testimony of their own administrators who negotiated these agreements, and it's undermined by the agreements. It's also undermined, frankly, by every court that has addressed this issue in this business context. So this case came from an MDL. There were summary judgment orders in the MDL that addressed this issue, granting summary judgment, finding no fiduciary duty. Related cases, the Minshew, Mochul, Carpenters cases all cited, including this — the New York AG case that we cited, all looked at this and said, look, the nature of these relationships, the nature of this business, the PBM, in this case, NPA, negotiated those on its own behalf before the clients came to them. That's the prospect. That is the value proposition, if you will. Well, what about the documents where the NPA described itself as having a fiduciary-like role? I'm glad you asked that, Judge Park. So let's look at those documents. So the one that they're — the fiduciary-like document, for example, is a 2001 proposal. At that point, they were already terminating the relationship. That is a proposal for a new relationship that postdates that. And they asked Mr. Ullman what he meant, what he thought the company meant, when they put, you know, in the future, we will conduct ourselves in a fiduciary-like manner. What did you mean by that? And you know what he said? Not a fiduciary. And they said, well, what's the difference? And he said, well, one is and one isn't. It's like, you know, analogy — and I hate analogies because they always end up backfiring, but, you know, analogy might be the difference between saccharin and sugar, right? Saccharin may be like sugar, but there's a fundamental difference in its inherent characteristic. One is, one isn't. And the other documents that they cite, a letter, a 1997 letter that was sent to Shearing, not referencing them, it was a letter that the author, who was an MPA executive, said he was angry, he was writing this, he was trying to make a point. They never saw that. They never saw that until it was produced in this litigation. The other one they cite, which is a 2002 letter, again, this relationship ended in 2002, also, that was drafted to a manufacturer. That was not even sent. It was a draft. Mr. Debris says that was a draft. He deleted it. He never even sent the letter. And, again, it wasn't to them. And Judge Daniels was absolutely right to say, how could you have relied on this? How could you have relied on these documents, one that was never sent, others you never saw until they were produced in this litigation? How could you rely on these documents to say that you — that that was the basis for forming this relationship? It doesn't make any sense.  The breach of contract was in the earlier case with Kobach. Tell me how you would be prejudiced if it was — if the amendment was allowed now. So, first of all, Kobach asserted breach of contract claims under its contract. And this idea that they were somehow — you know, that their contract claims were embraced by that, that's ignoring basic pleading, Your Honor. You know, we — I want to be clear. This case proceeded for a decade before they sought leave to amend. The 17 witnesses had been deposed. Witnesses had died. Our counsel tells us that discovery is still open. You know, I don't know how you can say that with a straight face when both sides had filed cross motions for summary judgment on all the claims that were pending in the case. When a party's filed cross motions for summary judgment and no one files a Rule 56D, I think the Court and the parties can reasonably conclude that we have decided that discovery on those issues is completed. Discovery was completed. And I want to emphasize, they're not just changing claims. They're changing relief. They've added a — they're adding administrative errors, other claims that were not at issue before. And quite frankly, as a basic principle, and this Court said it in McCarthy, a party is entitled to rely on the pleadings before it. We don't have to guess about what they might state. And they said that they said they were going to be a class rep. Well, you know what they said the next year? The next year, they submitted a status report that said we're pursuing only our individual claims. So we rely on the pleadings, and we have a right to rely on those pleadings in forming our case and our legal strategy. They wanted to hold this back in their back pocket as sort of their ace in the hole until the last minute and then attempt to play it? That's inherently prejudicial. The district court was absolutely right to reject that kind of tactical play. For whatever reason, whatever justification they had, it's inappropriate. And the prejudice here was caused by them, by them alone, and it's obvious. One last point on that that I — Breyer. Let me just focus. And we are talking about the prejudice as it existed in 2010, right? Absolutely, Your Honor. I think it's gotten worse. I mean, we're 40 years into this relationship now. But by 2010, 17 depositions, witnesses had died, including Mr. Ullman. Discovery was complete. When we filed cross motions for summary judgment, that is a signal that discovery was complete. One last point. Those motions were all made in 2010 or approximately that. Right, Your Honor. Absolutely. And, Your Honor, they characterized Judge Daniels' finding mere delay. And I want to just briefly correct that. He did not say mere delay. They put that in quotes. That's not what he said. He said unjustified, undue delay that will unnecessarily delay these proceedings. That is exactly what this Court has said constitutes prejudicial conduct. And he was completely within his discretion to not grant leave to amend under those circumstances. You were on notice, weren't you? I'm sorry? You were on notice that there was a breach of contract claim. No, Your Honor. We were not. We absolutely were not. You weren't? What about from the COBA case? We were on notice that COBA was pursuing a breach of contract claim under COBA's contract. They were separate contracts, Your Honor. We were not on notice that Lynch intended to pursue a contract claim in breach of good faith and fair dealing claims and claims for administrative errors that were not asserted in the original complaint. Were there real differences between the COBA contract and the PBA contract? I believe so, Your Honor. And I think we would have asked different questions. And I think, frankly, you want my speculation as to why they didn't bring it in the first instance? I think because they thought those material differences in the contracts would have undermined their ability to certify a class. And so they said, we're going to hang our hat on being a fiduciary claim and maybe we'll get a class certified. That's the tactical decision they made. That's the tactical consequence of that, is that they can't leave to amend at the end of the day and change the whole game and start over and get a second bite of the apple. Thank you. Thank you, Your Honors. Mr. Jasinsky. Let me address a couple points. Why should we let you amend now? Well, first, Your Honor, they were on notice. So Judge Lynch, you asked about whether there are material differences between the COBA contracts and our contracts. I think the answer is no. I think the COBA contracts the Court could look at, they are on the record in the MDL. I'll give you the MDL docket entry is 57-2. Well, why don't you tell me in sort of simple English, what are your contract claim is that the contract required them to give you the benefit of any rebates they negotiated. Is that right? Correct. And the best — And you're telling me that if I do go and look on the MDL record, I will see that the contractual language on which you are relying is the same as the language in the COBA case? You will see that the COBA case is not completely identical, but nearly identical to the funds contracts. Materially identical. Materially identical to the funds contracts. I think certainly in some substance with respect to what matters here. But, I mean, to the notice piece, so COBA was a putative class. We were a member of the putative class, as mentioned before. But in March of 2008, we notified the defendants expressly, and we notified the intended to jointly move for class certification on all of these common law claims. Breach of fiduciary duty, breach of contract, all of them. And we did. We filed a motion for class certification at the same time that we moved for partial summary judgment solely on the issue of whether they were — When you say we, I'm a little perplexed. We and COBA. You and COBA jointly filed a motion for class certification on claims — on which claims? On all of the common law claims, including the ones we hadn't pled yet. That's right. I mean, and that's why I called this a cleanup motion to amend, because we had — What happened with that motion? I'm sorry? What happened with the motion to certify? So ultimately, this case went up to the Eighth Circuit on a different issue involving the AG release, which we hope you reach. But COBA gave up the fight at that point, and we, when we came back to New York, said we're not going to try and pursue this as a class action. So ultimately, that motion was essentially withdrawn. But it was filed as a motion by both COBA and the funds at the same time, and I think this is an important point to make, that it's — summary judgment didn't indicate the close of discovery in this case. We moved solely on the issue of were they a fiduciary or not a fiduciary at the same time that the motion for class certification was filed. So this was not that we were at the summary judgment stage or we had a complete record and we were on the merits. In fact, if you look through the status reports and the MDL, you'll see that the discovery had been class certification discovery and that — and that leading up to our motion for class certification, we had taken a lot of their — their depositions and they said we're going to — to take our depositions of the funds after the motion for class certification is filed. When did this case come back from MDL? When did it come back from the MDL? It came back from the MDL, I believe, in 2015 or 16, Your Honor. I can — I'll give you the date. It was remanded in December of 2015. And we were before Judge Daniels in April of 2016 on what we thought was the gating issue, which was this renewed motion. This is the third issue in our brief, this renewed motion with respect to the attorney general release. And — But you still then didn't move to bring in breach of contract. We already had, Your Honor. We moved in 2010. We followed the motion for leave to amend in — in December of 2010. While the case was in MDL? While the case was in the MDL. And the motion was still pending when we came back from the MDL in 2016, and it was still pending until Judge — Do you assume Judge Daniels was aware of that when he turned down the motion in this case? Aware of which point, Your Honor? When he turned down the motion to — to amend? I'm sorry, but he was aware of what, Your Honor? He was aware of the earlier motion? It was the earlier motion that he denied. Oh, that was — oh, so he didn't make a new motion. There was only — there was one motion to amend that was filed in 2010, and that was the one Judge Daniels denied in 2019. Thank you. Thank you, Your Honor. Thank you both. Interesting case. Your Honor, if I could just correct one thing on the — I think it's easier to speak. He stated that when they moved on the fiduciary claims, they just moved on duty and not breach. If you look at the docket entry 394, they moved on duty and breach all claims. We did the same. And I think he just misspoke. Thank you. That concludes our calendar, so I'll ask the clerk to adjourn court. Court is adjourned.